UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT ASHLAND

CIVIL ACTION NO. 13-143-DLB-EBA

ASHLAND HOSPITAL CORPORATION,
d/b/a King's Daughters Medical Center                                      PLAINTIFF


vs.                              MEMORANDUM OPINION AND ORDER


RLI INSURANCE COMPANY                                              DEFENDANT

*** *** *** *** ***

        This insurance coverage dispute is before the Court on cross-motions for summary

judgment.  Defendant RLI Insurance Company contends that it does not have to provide

coverage to Plaintiff Ashland Hospital Corporation because Ashland gave untimely notice

of a claim.   Ashland asserts that notice was timely, but that even if it was not, RLI must

show substantial prejudice to deny coverage.  The matter is fully briefed and ripe for

review.  (Docs. # 28, 38, 51, 52, 75, 77-2, 78).  Because the Court concludes that Ashland

failed to comply with two conditions precedent to coverage by not providing timely notice,

and predicts that the Kentucky Supreme Court would not require RLI to show substantial

prejudice, Ashland's motion is **denied** and RLI's motion is **granted**.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

        The following facts are undisputed.  Ashland owns and operates King's Daughters

Medical Center in Ashland, Kentucky.  On July 25, 2011, the United States Department of

Justice issued a subpoena to Ashland as part of a Health Insurance Portability and

1

Accountability Act (HIPAA) investigation.  (Doc. # 28-1 at 5).  Among other documents, the subpoena requested e-mails, medical records, insurance billings, medical malpractice claims, and employment contracts related to nine doctors associated with Cumberland Cardiology and the Kentucky Heart Institute.  (Doc. # 28-2).  Ashland ultimately agreed to pay $40.9 million to resolve allegations that it billed federal health care programs for heart procedures that patients did not medically need.  (Doc. # 38-2).  This insurance coverage dispute stems from that investigation.

Ashland purchased a $15 million directors and officers liability insurance policy from Darwin National Assurance Company (the Primary Policy) covering the time period from October 1, 2010 through October 1, 2011.  (Doc. # 28-1 at 5).  Ashland also purchased a $10 million excess policy from Defendant RLI Insurance Corporation (the Excess Policy) covering the same time period, which is the policy in dispute.  (*Id.* at 6).  Ashland renewed both policies for October 1, 2011 through October 1, 2012.  (*Id.* at 7).

Both the Primary Policy and the Excess Policy are "claims-made" policies, as opposed to "occurrence" policies.[1]  The Excess Policy's insuring clause followed form to the Primary Policy, stating: "[c]overage hereunder shall then apply in conformance with the terms and conditions of the Primary Policy."  (Excess Policy; Doc. # 28-13 at 10).

Ashland notified Darwin of the HIPAA investigation on December 30, 2011.  (Doc. # 28-1 at 5).  In June 2012, Darwin acknowledged that its policy covered the investigation.

---

[1]  The two types of policies are distinct: a claims-made policy provides coverage for claims brought against the insured during the life of the policy; an occurrence policy provides coverage for acts done during the policy period irrespective of when the claim is brought. *United States v. A.C. Strip*, 868 F. 2d 181, 184 (6th Cir. 1989).

(*Id.*).  Darwin made its final payment covering the $15 million policy limit in April 2014.  (*Id.* at 6)*.*

Ashland first gave RLI notice of the HIPAA investigation on June 29, 2012.  (*Id.* at 8).  This set off a string of correspondence between the two parties with a central theme: Ashland asserting RLI had to provide coverage; RLI denying coverage on the basis of late notice.  On July 5, 2012, RLI sent Ashland a letter denying coverage on two grounds: (1) Ashland failed to give RLI notice within 30 days of giving notice to Darwin, and (2) Ashland failed to give notice before the policy terminated on October 1, 2011.  (*Id.* at 8, Ex. 16).  A few weeks later, Ashland sent RLI a letter contesting RLI's basis for denial, asking RLI to clarify its position, and inquiring into any prejudice that RLI may have suffered.  (Doc. # 28-1 at 8, Ex. 17).  RLI responded with a letter stating that the notice requirement was a condition precedent and that it did not have to show prejudice in order to disclaim coverage. (Doc. # 28-1 at 8, Ex. 18).

Nine months later, on April 9, 2013, Ashland asked RLI to reconsider its position because of, among other reasons, the Kentucky Supreme Court's holding in *Jones v. Bituminous Casualty Company*, 821 S.W.2d 798 (Ky. 1991).  (Doc. # 28-1 at 9*,* Ex. 19). In response, RLI stated that it believed *Jones* did not apply, and reaffirmed its position on coverage.  (Doc. # 28-1 at 9*,* Ex. 20).  Ashland sent RLI another letter, to which RLI did not reply.  (Doc. # 28-1 at 10*,* Ex. 21).  This action followed.

In Ashland's Second Amended Complaint, it brings claims for breach of contract, common law failure to act in good faith, and statutory failure to act in good faith in violation of Ky. Rev. Stat. § 304.12-230.  (Doc. # 25).  In addition, Ashland requests relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.  (*Id.*).  After filing suit, Ashland gave RLI

3

notice that the Primary Policy had been exhausted.  (Doc. # 28-23).

## II.   ANALYSIS

### A.   *Standard of review*

A court must grant "summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists when there are "disputes

over facts that might affect the outcome of the suit under the governing law."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When a court reviews cross-motions for

summary judgment, it must evaluate each motion on its own merits and draw all facts and

inferences in the light most favorable to the nonmoving party.  *Taft Broad. Co. v. United*

*States*, 929 F.2d 240, 248 (6th Cir. 1991).

### B.   *Breach of contract claim*

Kentucky substantive law applies in this diversity case.  *Hanover Ins. Co. v. Am.*

*Eng'g Co.*, 33 F.3d 727, 730 (6th Cir. 1994).  In Kentucky, "the law of the state with 'the

most significant relationship to the transaction and the parties' governs the dispute."

*Pedicini v. Life Ins. Co. of Ala.*, 682 F.3d 522, 526 (6th Cir. 2012) (quoting *State Farm Mut.*

*Auto. Ins. Co. v. Marley*, 151 S.W.3d 33, 42 (Ky. 2004)).  Because the insurance contract

was issued in Kentucky to a Kentucky corporation, the Court will apply Kentucky law.

When the Kentucky Supreme Court has ruled on a relevant issue, the Court will apply that

holding; when it has not, the Court will "anticipate how" it would rule.  *Scottsdale Ins. Co.*

*v. Flowers*, 513 F.3d 546, 563 (6th Cir. 2008).   Intermediate appellate decisions are

persuasive authority "unless it is shown that the state's highest court would decide the

4

issue differently." *Id.* (citation omitted).

Under Kentucky law, "the construction and legal effect of an insurance contract is a matter of law for the court." *Bituminous Cas. Corp. v. Kenway Contracting, Inc.*, 240 S.W.3d 633, 638 (Ky. 2007). A court's duty is to determine the parties' intent at the time they entered into the contract. *Nationwide Mut. Ins. Co. v. Nolan*, 10 S.W.3d 129, 132 (Ky. 1999). Ky. Rev. Stat. § 304.14–360 mandates that "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy."

Insurance contracts are "interpreted in light of the usage and understanding of the common man." *Bituminous Cas. Corp.*, 240 S.W.3d at 638. When an insurance contract is clear and unambiguous, it is enforced as written. *Kemper Nat. Ins. Companies v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 873 (Ky. 2002). However, when it is "susceptible to two reasonable interpretations, the interpretation favorable to the insured is adopted." *St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 226 (Ky. 1994). But, that "does not mean that every doubt must be resolved against [the insurer]." *Id.* A court must still give the contract "a reasonable interpretation consistent with the parties' object and intent." *Id.*

Relevant to this case, "under Kentucky law, conditions precedent are given full effect and may not be eliminated from insurance contracts by the courts." *Estate of Riddle ex rel. Riddle v. S. Farm Bureau Life Ins. Co.*, 421 F.3d 400, 406 (6th Cir. 2005) (citing *Investors Syndicate Life Ins. & Annuity Co. v. Slayton*, 429 S.W.2d 368, 370 (Ky. Ct. App. 1968) and *Northwestern Mut. Life Ins. Co. v. Neafus*, 40 S.W. 1026, 1028–29 (Ky. 1911)). Therefore, "[i]n an action on an insurance policy, the insured must prove compliance with the policy's conditions precedent or a waiver thereof to recover under its terms." *Id.* (citing *Am.*

5

*Centennial Ins. Co. v. Wiser*, 712 S.W.2d 345, 346 (Ky. Ct. App. 1986)).  Finally, notice provisions are generally enforceable in Kentucky.  *One Beacon Ins. Co. v. Chiusolo*, 295 F. App'x 771, 776 (6th Cir. 2008).

### 1.     Ashland failed to give timely notice after the Excess Policy expired

RLI asserts that it does not have to provide coverage for the HIPAA investigation because Ashland did not give notice within 90 days after the Excess Policy expired.  (Doc. ## 38 at 13, 24 n. 11; 75 at 6-8). The Primary Policy requires:

> As a **condition precedent to any right to payment** in respect of any Claim . . . [Ashland] must give [Darwin] written notice of such Claim, with full details, as soon as practicable after it is received . . . [i]n **no event may notice be provided more than ninety (90) days after** expiration . . . of **the Policy Period**."

(Endorsement No. 8; Doc. # 28-3 at 12) (emphasis added).  Meanwhile, the Excess Policy's insuring clause states that "[c]overage hereunder shall then apply in conformance with the terms and conditions of the Primary Policy . . . except as otherwise provided herein.  In no event shall this Policy grant broader coverage than would be provided by [the Primary Policy]."  (Endorsement to the Insuring Clause; Doc. # 28-13 at 10).  The Excess Policy is therefore a "follow-form" policy.

When an excess insurance contract "follows form" to the primary policy, it incorporates the primary policy's terms and conditions, unless there is a conflict.  *See GenCorp, Inc. v. Am. Intern. Underwriters*, 178 F.3d 804, 819 (6th Cir. 1999) (stating that when the insured, GenCorp, "acquired the Excess Policies, it agreed that they would follow form to the Genco Policies. This means that, with certain exceptions, the provisions of the

Genco Policies would be read into the Excess Policies.").[2]  The Court predicts that the Kentucky Supreme Court would follow the weight of authority and hold that the Excess Policy incorporated the Primary Policy's conditions.  *See State Farm Mut. Auto. Ins. Co. v. Marley*, 151 S.W. 3d 33, 44 n.1 (Ky. 2004) (Cooper, J., dissenting) ("A 'follow form' policy is an excess liability or reinsurance policy that simply extends the limits of the underlying policy by incorporating by reference all of the terms and conditions of the underlying policy except as specifically stated otherwise.").

Ashland admits that the Excess Policy followed-form to the Primary Policy (Doc. # 28 at 6), but argues that it did not need to report the HIPAA claim "to RLI at any time" because the Primary Policy, and therefore the Excess Policy, are "claims-made" policies, not "claims-made-and-reported" policies.  (Doc. ## 28 at 7, 23, 25; 51 at 11; 75 at 6). Ashland gives the following definition of the two types of policies: "a claims-made policy . . . obligate[s] the insurer to insure claims made against the insured during the policy period . . . a claims-made-and-reported policy, by contrast, obligates the insurer to insure only those claims that are both made during the policy period and are reported to the insurer during the policy period (or during some extended period following the policy period)."[3]  (Doc. # 28 at 23).

---

[2] *See also Lexington Ins. Co. v. Western Pa. Hosp.*, 423 F.3d 318, 322 (3d Cir. 2005); *C.B. Fleet Co., Inc. v. Aspen Ins. UK Ltd.*, 743 F.Supp.2d 575, 584-585 (W.D. Va. 2010).

[3] Courts often conflate the two types of policies, but the nomenclature is not particularly significant.  What is significant is that some claims-made policies do not require notice within a time certain, while others do.  For reasons stated *infra*, the Court finds that the Excess Policy fits into the latter category.

First, Ashland suggests that the notice provision is ambiguous because it does not appear on the first page of the Primary Policy nor in either policy's insuring clause.[4] (Doc. # 51 at 11-12). Courts, however, have routinely rejected arguments that a notice provision is ambiguous just because it does not appear on a certain page or in a certain section of the insurance agreement. *A.C. Strip*, 868 F.2d 181, 186-87 (6th Cir. 1989) (holding that a notice provision was unambiguous even though it did not appear on the agreement's cover sheet); *Wendy's Int'l, Inc. v. Ill. Union Ins. Co.*, No. 2:05-CV-803, 2007 WL 710242, at *9 (S.D. Ohio Mar. 6, 2007) ("[T]he fact that the Policy is not titled a "claims-made-and-reported" policy does not negate the reporting requirement contained in the notice provision."); *Janjer Enter., Inc. v. Exec. Risk Indem., Inc.*, 97 F. App'x 410, 415 (4th Cir. 2004) ("[P]lacing a reporting requirement in a policy's declaration page or insuring agreement is . . . not the exclusive manner. Parties may also create a 'claims made and reporting' policy . . . in another part of the policy."); *4th St. Investors LLC v. Dowdell*, No. 06-536, 2008 WL 163052, at *3-4 (W.D. Pa. Jan. 15, 2008). *But see Newlife Sciences LLC v. Landmark Am. Ins. Co.*, 2014 WL 631141, at *3-4 (N.D. Cal. Feb. 18, 2014). Moreover, because the Excess Policy's insuring clause expressly states that coverage applies "*in conformance with* the terms and *conditions* of the Primary Policy," the notice requirement is part of the Excess Policy's insuring clause. (Doc. # 28-13 at 10) (emphasis added).

The general description provided on the first page of the Primary Policy does not render ambiguous the more specific provisions contained in the policy. *See A.C. Strip*, 868

---

[4] The front page of the Primary Policy states: "This is a claims made policy which applies only to claims first made during the policy period. . . . Read and review the policy carefully." (Doc. 28-3 at 2).

F.2d at 186.   The second page states: "[t]hese declarations, the policy form, any endorsements and the application constitute the entire agreement between the insurer and the insured relating to this insurance."  (Doc. # 28-3 at 3).  The notice requirement then appears in Endorsement No. 8, which is on its own page, and in bold and capital letters is titled "Amend reporting of claims provision notice to specific insureds."  (*Id.* at 12).  There is no indication that the Kentucky Supreme Court would require that the notice provision appear elsewhere in order to be effective.[5]

Next, Ashland argues that because the Excess Policy contains its own notice requirements in Section 10, it does not incorporate Endorsement No. 8 of the Primary Policy.  (Doc. # 77-2 at 11).  In support, Ashland notes that the follow-form clause in the Excess Policy incorporates the Primary Policy "except as otherwise provided herein." (Endorsement to the Insuring Clause; Doc. # 28-13 at 10).  Ashland cites to case law that suggests conditions in a primary policy are not incorporated when they conflict with language in the excess policy.  (Doc. # 77-2 at 11 n.5).

Ashland's argument fails because the notice requirements in Section 10 do not conflict with the notice requirement in Endorsement No. 8; rather, they supplement Endorsement No. 8 by adding additional reporting requirements.  (*See* Section 10 titled "Notice"; Doc. # 28-13 at 7-8).  The four events in Section 10 are specific to an excess insurance policy, require notice based on interactions between Ashland and the Primary Policy, and potentially require notice *during* the policy period; on the other hand, the notice

---

[5]   The Court notes that Ashland is arguing that the notice provision is ambiguous because it appears in the list of endorsements, while simultaneously claiming coverage under Endorsement No. 10.  (*See* Doc. # 28 at 5).

requirement in Endorsement No. 8 is equally applicable to both policies, and requires notice within a definite time *after* the policy period expired.  No language in the Excess Policy suggests that the parties intended Section 10 to replace the notice requirement in Endorsement No. 8.

Finally, Ashland suggests that the notice provision is unimportant because the parties deleted it from the subsequent renewal policy.  (Doc. # 51 at 12).  The Court will not consider this extrinsic evidence for two reasons: (1) the notice provision is unambiguous, and (2) the subsequent policy is not probative of the parties' intent when they entered into the Excess Policy.  *GenCorp, Inc.*, 178 F.3d at 820 ("[B]ecause as a general proposition we find the incorporation of the Endorsements into the Excess Policies via the follow form provisions unambiguous, extrinsic evidence is inadmissible.  Furthermore, the relevant intent for purposes of our analysis is the intent of [the parties] at the time they entered into the Excess Policies . . . .").

Because the Excess Policy follows form to the Primary Policy, it required as "a condition precedent to any right to payment" that Ashland had to give RLI notice of any claim within "(90) days after expiration . . . of the Policy Period."  (Endorsement No. 8; Doc. # 28-3 at 12).  This condition plainly, clearly, and unequivocally manifested RLI's intent – and the parties' agreement –  that RLI would provide coverage only if it received timely notice.  *See Woodson v. Manhattan Life Ins. Co. of N.Y.*, 743 S.W.2d 835, 839 (Ky. 1987).  The Excess Policy expired on October 1, 2011.  (Doc. # 28-13 at 4).  Yet, Ashland did not give RLI notice of the HIPAA investigation until nearly nine months later, on June 29, 2012.  (Doc. # 28-1 at 8).  As a result, Ashland failed to comply with a condition precedent to coverage.

2.    **Ashland failed to give timely notice under Section 10(b) of the Excess Policy**

Ashland gave Darwin notice of the HIPAA investigation on December 30, 2011, but did not give notice to RLI until June 29, 2012.  RLI argues that by giving notice six months after giving Darwin notice, Ashland failed to comply with a condition precedent to coverage specific to the Excess Policy.  The Court agrees.  RLI points to Section 10(b), which provides:

> The Insureds shall, as a **condition precedent to exercising their rights** under this Policy, **give the Insurer written notice of any of the following events** as soon as practicable, but **in no event later than thirty (30) days** after such event:
> (a) the alteration or cancellation of any Underlying Insurance;
> (b) any notice by the Insured under any Underlying Insurance;
> © any additional or return premiums charged or paid in connection with any Underlying Insurance; and
> (d) the exhaustion of the limit of liability under any Underlying Insurance.

(Section 10 titled "Notice"; Doc. # 28-13 at 7) (emphasis added).

In response, Ashland contends that it fulfilled the notice provision by complying with subparagraph (d). (*Id.* at 14)  It points to its April 7, 2014 letter, in which it informed RLI that seven days earlier it had exhausted the Primary Policy.  (*Id.*).  Ashland argues that "any" in Section 10 does not mean "all," and that therefore it did not have to give notice of each event, but just one of them.  (*Id.* at 14-15).  RLI rejects this interpretation and contends that each event, if and when it occurred, required notice within 30 days.

In support of its argument, Ashland points to cases where the Kentucky Supreme Court has found that "any" did not mean "all." (*Id.*).  The holdings of those cases, however, are restricted to their respective facts.  For example, in *Miles v. Dawson*, 830 S.W.2d 368,

11

369 (Ky. 1991), the court, after stating that it was "not unmindful of previous cases in which the word 'any' was held to mean 'all,'" concluded that "any" did not mean "all" in a statute due to the specific legislative intent.  Similarly, in *Elliot v. Pikeville National Bank & Trust Co.*, 128 S.W.2d 756, 761 (Ky. 1939), the court noted that "any" in wills and statutes "has been construed to mean 'all,'" but held that in a letter from a bank to a debtor the word "any" did not refer to "all" the debtor's obligations.  The court concluded that the bank would not reasonably agree to release all the debtor's obligations in exchange for mining equipment that was in "bad condition and getting worse," approaching "junk."  *Id.* at 761. These cases recognize that, when applied to the surrounding facts and circumstances, "any" may not mean "all."

While the Court agrees that "any" does not always mean "all*,"* it rejects Ashland's argument that the term is inherently ambiguous.  The United States Supreme Court has recognized that "the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"  *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (citing Webster's Third New International Dictionary 97 (1976)).  In *Gonzales*, because there was no language "limiting the breadth of" the word any, the Court interpreted the phrase "any other term of imprisonment" to refer to "all 'term[s] of imprisonment.'"  *Id.* (interpreting 18 U.S.C. § 924(c)(1)).  And as the Kentucky Supreme Court has noted "'any' is very broad and generally has a diversity of meaning, depending upon the context and subject matter of the instrument in which it is used.  It is often used in the sense of 'every' or 'all.'" *Johnson v. Johnson*, 297 Ky. 268, 178 S.W.2d 983, 986 (1944); *Wadsworth Mfg. Co.*, *Inc. v. Kenton Cnty. Airport Bd., Inc.*, 509 S.W.2d 270, 272 (Ky. 1974) (giving "any" an expansive meaning and holding that it allowed an airport board to acquire land "wherever"

12

located).

As stated *supra*, the Court must construe the Excess Policy according to "the entirety of its terms," Ky. Rev. Stat. § 304.14–360, in order to give the contract "a reasonable interpretation consistent with the parties' object and intent," *St. Paul Fire & Marine Ins. Co.*, 870 S.W.2d at 226.  Upon reviewing the entire policy, the only reasonable construction is that Ashland was required to give RLI notice within 30 days of each of the four events listed in Section 10.  Ashland's interpretation, that it could give notice after whatever event it pleased, is a "strained" one that contravenes logic and common sense. *See Scottsdale Ins. Co*, 513 F.3d at 564 (quoting *K.M.R. v. Foremost Ins. Grp.*, 171 S.W.3d 751, 753 (Ky. Ct. App. 2005)).

First, there is no language in the contract limiting "any's" otherwise expansive meaning.  *See Gonzales*, 520 U.S. at 5.  Second, Ashland's interpretation ignores the surrounding terms.  Section 10 required Ashland to give notice of "any of the following events *as soon as practicable*."  It is not logical that the parties agreed that Ashland had to act with urgency in giving notice, but at the same time could give notice of whichever event it wanted.  Such an unreasonable interpretation is highlighted by the fact that some of the events are wholly unrelated, for example: section (a) ("the alteration or cancellation of any Underlying Insurance") and section (d) ("the exhaustion of the limit of liability under any Underlying Insurance").  It is unreasonable that RLI would agree to receive notice of *either* of these distinct events, but entirely reasonable that RLI would negotiate for notice of *both* events.

Third, Ashland's interpretation renders certain events meaningless; specifically, Ashland would never have to provide notice of section (b) ("any notice by the Insured under

13

any Underlying Insurance") since that event will always occur before section (d) ("the exhaustion of the limit of liability under any Underlying Insurance"). *Kemper Nat'l Ins. Cos.,* 82 S.W.3d at 875 ("[A]n insurance contract must be construed without disregarding . . . words or clauses."). Finally, Ashland's interpretation leads to the bizarre result that it would not have to give RLI notice even when its policy with Darwin had been exhausted, so long as the policy had not been cancelled (section (a)).

In arguing that its interpretation is reasonable, Ashland again points to the parties' decision to delete Section 10 in the renewal policy. (Docs. ## 28-1 at 15 n.2; 51 at 2). Section 10 was replaced by a provision that required Ashland to give RLI notice once Darwin paid 50% of the Primary Policy's limit. (Doc. # 28-15 at 7). However, as discussed *supra*, because the Court finds the contract's terms unambiguous and the renewal policy irrelevant, it will not consider this extrinsic evidence. *3D Enter. Contracting Corp. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005) ("When no ambiguity exists in the contract, we look only as far as the four corners of the document to determine the parties' intentions.").

In concluding that Ashland had to give notice of each event, the Court is confident that it has interpreted the contract according to the parties' intentions. On at least two occasions, Ashland has admitted that it was required to give notice at an earlier date. The first was in an April 9, 2013 letter from Ashland's counsel, in which he stated "[Ashland] notified RLI on June 29, 2012, that [Ashland] had given notice to Darwin. This was five months after [Ashland] was required by Section 10 of the RLI policy to give such notice to

14

RLI." (Doc. # 28-20 at 3). And in Ashland's original complaint,[6] it pleaded that "[b]y letter dated June 29, 2012, [Ashland] gave notice to RLI that [Ashland] had given notice to Darwin of a HIPAA Regulatory Claim. This was about five months after [Ashland] was required by the RLI Excess Policy to give RLI such notice." (Doc. # 1 at ¶ 23).[7] Because the Court finds the contract unambiguous, it does not rely on this extrinsic evidence, but had the Court found the contract ambiguous, this evidence would lead the Court to the same conclusion: as a condition precedent to coverage, Ashland had to give RLI notice of the HIPAA investigation within 30 days of giving notice to Darwin. Ashland failed to do so, and therefore RLI has no duty to provide coverage.

### 3.    RLI does not have to show substantial prejudice to deny coverage

Ashland argues that "under Kentucky law RLI may not deny coverage to [Ashland] for providing such notice late unless RLI could prove that it suffered 'substantial prejudice' as a result of the late notice." (Doc. # 28 at 16). In support, Ashland cites *Jones v. Bituminous Casualty Corporation*, 821 S.W. 2d 798 (Ky. 1991). As the Sixth Circuit has noted:

> *Jones* . . . adopted an exception to th[e] general rule. It held that an insurer cannot deny coverage due to an insured's untimely compliance with a notice provision unless the insurer can prove that it suffered substantial prejudice from the delay. The insurance policy addressed in *Jones* was for workers'

---

[6] Contrary to Ashland's argument, the allegations in Ashland's original complaint constitute an admission against interest notwithstanding Ashland having filed an amended complaint. *Shell v. Parrish*, 448 F.2d 528, 530 (6th Cir. 1971); *Pa. R.R. v. City of Girard*, 210 F.2d 437, 440 (6th Cir.1954) (noting that "pleadings withdrawn or superseded by amended pleadings are admissions against the pleader in the action in which they were filed").

[7] In Ashland's own motion for summary judgment, it appears to acknowledge that notice was late a third time, stating "[a]lthough Section 10(b) of the Excess Policy requires [Ashland] to give notice to RLI of any notice given by [Ashland] to the underlying insurer . . . ." (Doc. # 28-1 at 23).

compensation coverage; whether *Jones* applies to all types of insurance is not entirely settled.

*One Beacon Ins. Co.*, 295 F. App'x 771, 776 (6th Cir. 2008).

It is not necessarily dispositive that the policy at issue was an excess policy and the notice provision a condition precedent.   Courts have held that *Jones* can apply in both contexts.   *Nautilus Ins. Co. v. Structure Builders & Riggers Mach. Moving Div., LLC*, 784 F. Supp.2d 767, 770-71 (E.D. Ky. 2011) (applying *Jones* to an occurrence policy where the notice provision was a condition precedent to coverage); *Old Republic Ins. Co. v. Underwriters Safety and Claims, Inc.*, 306 F. App'x 250, 254 (6th Cir. 2009) ("We believe . . . the Kentucky Supreme Court [would] extend the *Jones* rule to the excess-liability context.").   What is unsettled is whether Kentucky would extend *Jones* to a claims-made policy like the one here, which requires the insured to provide the insurer with notice of a claim within a definite time both after the insured reports the claim to the primary insurer *and* after the policy expires.

> ### a.   The greater weight of authority, and the sound reasoning behind those opinions, lead to the conclusion that Kentucky would not require RLI to show prejudice

No Kentucky state court has specifically addressed this issue.   However, the Western District of Kentucky did not apply *Jones* to a claims-made policy with a reporting requirement.   *See Trek Bicycle Corp. v. Mitsui Sumitomo Ins. Co. Ltd.*, No. 5:05-cv-44-r, 2006 WL 1642298, at *3 (W.D. Ky. June 7, 2006).   In *Trek Bicycle*, the insured failed to report a claim in a timely manner under a claims-made-and-reported policy.[8] *Id.* at *2.   The

---

[8]   The policy stated "[c]overage hereunder shall apply only in respect of claim(s) made against any Insured during the policy period of this insurance stated in the Declaration . . . and of which immediate notice has been given in accordance with the Conditions herein . . . ." *Id.*

insured – like Ashland here – argued that under *Jones* the insurer had to prove prejudice to disclaim coverage. *Id.* The court recognized that no Kentucky case had addressed whether the notice-prejudice rule applied to a claims-made policy, but that under "the majority rule in other jurisdictions *. . .* failure to notify within the specified period of time will defeat coverage." *Id.*

The court concluded that *Jones* did not apply because "[t]o allow coverage under these circumstances simply rewrites the policy." *Id.* at 3. Specifically, the court noted:

> claims[-]made policies are different. . . . The advantage of a claims[-]made policy is that the insurer and the insured know their exposure at a fairly certain time. Consequently the insurer is better able to predict the limits of the exposure and more accurately to estimate the premium schedule necessary to accommodate the risk undertaken.

*Id.*

Ashland argues that *Trek Bicycle* does not apply because "[u]nlike the policy in *Trek Bicycle*, the RLI Excess Policy is a 'claims-made' policy, not a 'claims-made-and-reported' policy." (Doc. # 28-1 at 24). The Court rejected this argument *supra* (Part II, Section B(1)), finding that the Excess Policy required Ashland to give RLI notice of any claim within 90 days after the policy period expired and within 30 days of giving notice to Darwin.

In an attempt to distinguish *Trek Bicycle*, Ashland argues that the notice requirements in the Excess Policy are "mere condition[s]," rather than a part of the parties' essential bargain. (Doc. ## 28 at 24; 51 at 9). Generally, a notice requirement is a material provision in a claims-made-and-reported policy. *See A.C. Strip*, 868 F.2d at 187 (stating that the reporting requirement "is exactly th[e] aspect of a claims made policy that distinguishes it from an occurrence policy."). Nevertheless, Ashland asserts that the notice requirements are not a defining characteristic in the Excess Policy because they are not

17

part of the policy's insuring clause.  That argument ignores the insuring clause's plain language, which expressly provides that coverage applies in conformance with the Primary Policy's conditions, and therefore includes the notice requirement in Endorsement No. 8. It further ignores the Excess Policy's introductory statement, which references the notice requirements in Section 10 by stating that the parties' agreement is "subject to the . . . conditions . . . of this Policy."  (Doc. # 28-13 at 6).

Ashland again points to the changes made to the notice requirements in the parties' renewal policy.  (Doc. # 28-1 at 24).  But as discussed *supra*, the Court does not find this extrinsic evidence relevant or admissible.  Because they are both claims-made policies with unambiguous reporting requirements, the Excess Policy and the insurance agreement in *Trek Bicycle* are similar.  *See* 2006 WL 1642298, at *2.

As the district court identified in *Trek*, a majority of jurisdictions do not require an insurer to show prejudice when an insured fails to comply with a notice condition in a claims-made-and-reported policy.  *See e.g., Union Planters Bank, N.A. v. Cont'l Cas. Co.*, 478 F.3d 759, 767 (6th Cir. 2007) (holding that under Tennessee law an insurer does not have to show prejudice when an insured fails to comply with a notice provision in a claims-made policy); *Secure Energy, Inc. v. Philadelphia Indem. Ins. Co.*, No. 4:11CV1636 TIA, 2013 WL 2145927, at *5 (E.D. Mo. May 15, 2013) (concluding that based on Missouri precedent an insurer "is not required to demonstrate that it was prejudiced by [the insured's] failure to provide timely notice under the claims made policies"); *Emissions Tech., Inc. v. Twin City Fire Ins. Co.*, No. CV10-0393-PHX-NVW, 2010 WL 4579250, at *3 (D. Ariz. Nov. 4, 2010) (holding that under Arizona law  a claims-made-and-reported policy . . . requires no showing of prejudice").  These cases uniformly recognize that notice

18

provisions are a key feature of claims-made-and-reported policies, and when enforced, benefit insurers by allowing them to take on less risk, which in turn benefits insureds because the insurer can charge a lower premium.  *See Gulf Ins. Co. v. Dolan, Fertig & Curtis*, 433 So. 2d 512, 515-16 (Fla. 1983) (providing an excellent discussion of why the reporting requirement is a defining characteristic in a claims-made-and-reported policy).

Ashland cites to a few jurisdictions where courts have required insurers to show prejudice in order to decline coverage for late notice under a claims-made policy.  (Doc. # 51 at 15-16).  Some of these cases involve insurance contracts different from the one here. For example, in *Pension Trust Fund for Operating Engineers v. Federal Insurance Co.*, 307 F.3d 944, 956 (9th Cir. 2002), the policy "was a claims-made policy with no reporting requirement.  The policy language required that [the insured] provide notice of claims 'as soon as practicable.' It did not require that the claims be reported within the policy period, or even within a specific number of days thereafter."  To the extent that some of the cases are not distinguishable, they represent the minority view, and the Court considers the reasoning behind the majority position more sound and persuasive.  Therefore, the Court predicts that the Kentucky Supreme Court would adopt the majority position and conclude that requiring an insurer to show prejudice under a claims-made-and-reported policy rewrites the contract and eliminates the benefit the reporting requirement provides to both parties.

### b.   The reasons given in *Jones* for adopting the "notice-prejudice" rule do not apply here

The Court in *Jones* decided to adopt the notice-prejudice rule because of "four major features in the status of insurance law . . . ."  821 S.W.2d at 801.  First, "standard form

insurance policies such as this are recognized as contracts of adhesion because they are not negotiated; they are offered to the insurance consumer on essentially a 'take it or leave it' basis without affording the consumer a realistic opportunity to bargain." *Id.* Second, "by failing to define prompt notice or to warn of a forfeiture, [denying coverage] falls beyond the reasonable expectations of the ordinary insurance consumer." *Id.* at 802. Third, the insured "purchased this policy of public liability insurance because it was required by law . . . ." *Id.* And fourth, "in the absence of prejudice a strict forfeiture clause simply provides the insurance company with a windfall." *Id.* Ashland argues that these four reasons apply with equal force to a claims-made policy, and specifically to the Excess Policy. (Doc. # 28-1 at 16-17). The Court disagrees.

First, the Excess Policy was not offered on a "'take it or leave it' basis without affording [Ashland] a realistic opportunity to bargain." *See Jones*, 821 S.W.2d at 801. Ashland hired a broker to advocate and negotiate on its behalf in obtaining the policy. (Doc. # 76-1 at 50:12-55:4). To be sure, Ashland's broker had the option of choosing among different policies (*id.*), and there is some evidence that Ashland was able to obtain modifications to the underlying Primary Policy, to which the Excess Policy followed form (*see* Doc. # 39-2 at DAR1030, 1033-38). *See Hiscox Dedicated Corp. Member Ltd. v. Wilson*, 246 F. Supp. 2d 684, 692 (E.D. Ky. 2003) (declining to apply *Jones* because, in part, "the precise degree of negotiation and ability to negotiate are disputed; however, [the insured] retained at least some bargaining power as his . . . agent was actually able to negotiate the insertion of [a clause]."). Unlike some standard form insurance policies, the Excess Policy is not a contract of adhesion. *See Union Planters Bank N.A.*, 478 F.3d at 767 (concluding that the notice prejudice rule did not apply to an insurance contract under

20

Tennessee law because, among other reasons, it was  "entered into by sophisticated parties, and there is no evidence that the [insured] was prevented from negotiating . . . moreover, [the policies] amount . . . to claims-based policies.").

Second, it should not fall beyond Ashland's "reasonable expectations" that RLI would decline coverage if Ashland provided untimely notice.  Endorsement No. 8 of the Primary Policy, which the Excess Policy expressly incorporated, states:

> As a condition precedent to any right to payment in respect of any Claim . . . [Ashland] must give written notice of such claim . . . .  In no event may notice be provided more than ninety (90) days after expiration . . . of the Policy Period.

Meanwhile, Section 10 of the Excess Policy provides:

> [Ashland] shall, as a condition precedent to exercising their rights under this Policy, give the Insurer written notice of any of the following events . . . in no event later than thirty (30) days after such event.

Compare these two provisions to the one at issue in *Jones*, which does not give a definite time when notice was due and does not state that failing to provide timely notice is a condition precedent to "any right to payment" or "exercising . . . rights":

> You must see to it that we are notified promptly of an 'occurrence' which may result in a claim.

821 S.W.2d at 800.  Unlike the policy in *Jones*, which failed  to "define prompt notice or to warn of forfeiture," *id.* at 802, the Excess Policy clearly defined when notice was due and the consequences if notice was late.[9]

---

[9]  There is a reasonable inference that Ashland understood the consequences of Endorsement No. 8 in the Primary Policy: it provided notice to Darwin of the HIPAA investigation exactly 90 days after the policy expired (policy expired on October 1, 2001; notice given on December 30, 2011).

Third, unlike the insured in *Jones*, Ashland has not suggested that it was statutorily obligated to purchase the Excess Policy. Rather, it appears to have been a strategic business decision. Thus, there is no concern that "a strict forfeiture regardless of prejudice [would] unreasonably interfere[] with coverage required by [law]." *Jones*, 821 S.W.2d at 802.

Finally, this is not a case where enforcing the contract as written results in RLI receiving an inequitable "windfall." A claims-made policy is different from an occurrence policy like the one in *Jones* because "the advantage of a claims[-]made policy is that the insurer and the insured know their exposure at a fairly certain time. Consequently the insurer is better able to predict the limits of the exposure and more accurately to estimate the premium schedule necessary to accommodate the risk undertaken." *Trek Bicycle*, 2006 WL 1642298, at *3. Requiring RLI to show prejudice would actually result in a windfall to Ashland: "[t]o allow coverage beyond that [reporting period in a claims-made policy] would be to *grant the insured more coverage than he bargained for and paid for*, and to require the insurer to provide coverage for risks not assumed." *A.C. Strip*, 868 F.2d at 187. Ashland likely received a lower premium *in exchange for* RLI taking on less risk. *AIG Domestic Claims, Inc. v. Tussey*, No. 2008-CA-001248-MR, 2010 WL 3603844, at *4 (Ky. Ct. App. Sept. 17, 2010) (Wine, J.,dissenting) ("Claims-based policies are often offered at lower premiums to an insured precisely because of the lower burden of risk carried by the insurer."). Enforcing the notice provisions merely holds the parties to the terms for which they bargained.

Based on the greater weight of authority and the sound rationale behind those opinions, and because the reasons in *Jones* for adopting the notice-prejudice rule do not

22

apply in this case, the Court predicts that the Kentucky Supreme Court would not extend *Jones* to the Excess Policy. Specifically, Kentucky would not apply *Jones* to an excess claims-made policy that requires the insured to provide the insurer with notice of a claim within a definite time both after the claim is reported to the primary insurer and after the policy expires.

### 4.    The renewal policy did not provide seamless coverage

Ashland contends that it is covered under the Excess Policy because "under Kentucky law back-to-back 'claims made and reported' polices provide 'seamless coverage,' such that a claim made during the first policy period and reported to the insurer during the second policy period is covered." (Doc. # 28-1 at 23). In support, it cites *AIG Domestic Claims, Inc. v. Tussey*, No. 2008-CA-001248-MR, 2010 WL 3603844 (Ky. Ct. App. Sept. 17, 2010).

*Tussey* is a 2-1 unpublished opinion from the Kentucky Court of Appeals. Similar to the facts here, the policy at issue in *Tussey* was a claims-made-and-reported policy, the policy was renewed without a lapse in coverage, and there was a claim made during the first policy period that the insured did not report until the second policy period. *Id.* at *1-2. Notwithstanding the insured's failure to abide by the notice provision, the court held that the insurer must provide coverage because "the renewal of the policy provided continual and seamless coverage to the [insured]." *Id.* at *4. The court focused its analysis on a discovery period provision that was "central to the arguments of both parties," and which evidenced "the expectation of the parties that renewal of the policy carried with it a continuation of coverage." *Id.* at *2-3.

23

In dissent, Judge Wine discussed that difference between claims-made and occurrence-based policies; specifically, he noted that "the reporting period is what defines coverage under 'claims-made' policies," and that claims-made policies are "offered at lower premiums to an insured precisely because of the lower burden of risk carried by the insurer." *Id.* at *4-5.  Judge Wine also recognized that the court was "breaking rank with the overwhelming majority of jurisdictions . . . who have repeatedly held that the failure to notify an insurer within the policy period in a claims-[made] policy defeats coverage . . . ." *Id.* at *5.  He further pointed out that the majority's decision was "contrary to the position taken by our own circuit and our own district courts." *Id.* at *5 (citing *A.C. Strip*, 868 F.2d 821 and *Trek Bicycle*, 2006 WL 1642298).  Judge Wine expressed concerns that the court's decision would have "ramifications in insurance premium costs to professionals and professional organizations all over this great Commonwealth." *Id.*

The Court will not apply *Tussey* for two reasons.  First, the Court predicts that the Kentucky Supreme Court would not adopt its holding.[10]  As an intermediate appellate decision, *Tussey* is only persuasive authority on how the Kentucky Supreme Court would rule. *In re Dow Corning Corp.,* 419 F.3d 543, 549 (6th Cir. 2005) ("Intermediate state appellate courts' decisions are also viewed as persuasive . . . .").  *Tussey* becomes less persuasive because it is a split-decision that conflicts with the overwhelming weight of authority. *Id.*; *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) ("[D]ecisions of the state appellate court . . . should not be disregarded *unless* we are presented with persuasive data that the [state's highest court] would decide otherwise.").

---

[10]  The Kentucky Supreme Court granted discretionary review in *Tussey*, but the parties ultimately filed a joint-motion to dismiss.

24

Furthermore, it is unpublished.[11]  For reasons stated throughout this Opinion, the Court believes the dissent provides the more sound analysis and is therefore the position the Kentucky Supreme Court would adopt.[12]

Second, *Tussey* is distinguishable from the facts here.  Ashland reads *Tussey* as setting a precedent that all "back-to-back" claims-made policies provide "seamless coverage."  (Doc. # 28-1 at 23).  This Court, however, interprets *Tussey*'s holding more narrowly.  The "central . . . arguments of both parties" in *Tussey* concerned a "discovery period" provision.  2010 WL 3603844, at *2.  After finding the policy ambiguous, the Court relied heavily on the discovery provision in concluding that the parties' expectation was that renewal provided seamless coverage.  *Id.* at *3; *see GS2 Eng'g & Envtl. Consultants, Inc. v. Zurich Am. Ins. Co.*, 956 F. Supp. 2d 686, 692 (D.S.C. 2013) ("In [*Tussey*], the court[] found the policy language ambiguous . . . .").  Moreover, the terms of the back-to-back policies in *Tussey* "remained identical."  2010 WL 3603844, at *2.

Ashland makes no argument as to how the discovery provision in the Primary Policy rendered the notice requirements *in this case* ambiguous or how it provided Ashland with an expectation of seamless coverage.  (*See* Doc. # 51 at 17).  Indeed, this Court has

---

[11]   Kentucky Rules of Civil Procedure (CR) Rule 76.28(4) states: Opinions that are not to be published *shall not be* cited or *used as binding precedent* in any other case in any court of this state; however, unpublished Kentucky appellate decisions . .. may be cited for consideration by the court if there is no published opinion that would adequately address the issue before the court.

[12]   The Court is mindful that in *C.A. Jones Mgmt. Grp., LLC v. Scottsdale Indem. Co.*, No. 5:13-CV-00173, 2014 WL 811654, at *6 (W.D. Ky. Feb. 28, 2014), the court predicted that the Kentucky Supreme Court would adopt *Tussey* notwithstanding the court's early ruling in *Trek Bicycle*.  That conclusion was *dicta*, however, as the court ultimately denied the insured's motion for a preliminary injunction due to other applicable exclusions in the contract.  *Id.* at *7-13.

concluded that the Excess Policy's notice provisions are unambiguous.  Additionally, unlike the "back-to-back" policies in *Tussey*, the terms of the renewal policy were not identical to the Excess Policy.  (*Compare* Doc. # 28-13 Section 10 *with* Doc. # 28-14 Section 4).  Most importantly, the Excess Policy contained an additional notice requirement not found in *Tussey*.  Specifically, Section 10 required Ashland to give RLI notice within 30 days of giving notice to Darwin, a requirement that has no nexus to the policy's expiration date or whether the policy was renewed.  Having found that the holding in *Tussey* would not be adopted by the Kentucky Supreme Court, and even if it were, that it would not apply to the facts of this case, the Court rejects Ashland's argument that the renewal policy provided seamless coverage.

### C.    *Bad faith claims*

Ashland brings a common law failure to act in good faith claim and a statutory failure to act in good faith claim under the Kentucky Unfair Claims Settlement Practices Act, Ky. Rev. Stat. § 304.12-230.  Both claims are premised on Ashland's allegation that RLI was obligated to provide insurance coverage under the Excess Policy for the HIPAA investigation.  (Doc. # 25 at ¶¶ 41-43, 47-49).  Ashland also asserts that RLI violated Ky. Rev. Stat. § 304.12-230 by the manner in which it investigated the claim and responded to Ashland's request for coverage. (*Id.* at ¶ 50).  Ashland requests that the Court deny RLI's motion for summary judgment because it has not yet had an opportunity to conduct discovery on the bad faith claims.  (Doc. # 52 at 10).

However, "absent a contractual obligation, there simply is no bad faith cause of action, either at common law or by statute."  *Davidson v. Am. Freightways, Inc.*, 25 S.W.3d 94, 100 (Ky. 2000).  This Court has ruled as a matter of law that RLI does not have to

26

provide coverage because Ashland failed to provide timely notice of the HIPAA investigation.  Because RLI does not have a contractual obligation to provide coverage, no amount of discovery will reveal a viable bad faith claim.  Therefore, Ashland's claims are dismissed.

### D. *Declaratory Judgment Act, 28 U.S.C. § 2201(a)*

Upon the Court's order, both parties addressed whether the Court should exercise discretionary jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201(a).  (Doc. ## 68, 70).  In Ashland's request for declaratory relief, it makes the same allegation it does in its breach of contract claim; specifically, that RLI is contractually bound to indemnify Ashland for its losses stemming from the HIPAA investigation.  (*Compare* Doc. # 25 ¶ 33 *with* ¶ 37).

In adjudicating the parties cross-motions for summary judgment on Ashland's breach of contract claim, the Court has addressed the merits of Ashland's request for declaratory relief and determined that RLI has no duty to indemnify Ashland for the HIPAA investigation. Because it would result in a redundant analysis, the Court will not exercise jurisdiction over Ashland's declaratory judgment claim. *Wilton v. Seven Falls* Co., 515 U.S. 277, 288 (1995) (stating that courts should consider "practicality and wise judicial administration" when determining whether to exercise DJA jurisdiction); *Scottsdale Ins. Co.*, 513 F.3d at 554 ("[T]he essential question is always whether a district court has taken a good look at the issue and engaged in a reasonable analysis of whether issuing a declaration would be useful and fair.").

## III.    CONCLUSION

Accordingly, for the reasons stated herein, **IT IS HEREBY ORDERED** that:

1.    Plaintiff Ashland Hospital Corporation's Motion for Summary Judgment (Doc. # 28) is **DENIED**.

2.    Defendant RLI Insurance Company's Motion for Summary Judgment (Doc. # 40) is **GRANTED**.   Therefore, all claims in Ashland Hospital Corporation's Second Amended Complaint (Doc. # 25) are **DISMISSED WITH PREJUDICE**.

3.    A Judgment shall be entered contemporaneously herewith.

This 17th day of March, 2015.



**Signed By:**

**_David L. Bunning_**

**United States District Judge**

G:\DATA\Opinions\Ashland\0-13-143 MOO granting RLI MSJ.wpd

28